**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: May 4 2018**

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 15-33538 |
| | ) | |
| BX Acquisitions, Inc., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 17-03024 |
| | ) | |
| Scott E. Eisenberg as Trustee of the BX Acquisitions, Inc. Liquidating Trust, | ) ) | Judge John P. Gustafson |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Toledo-Lucas County Port Authority, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OF DECISION AND ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT

This Adversary Proceeding is before the court on Plaintiff-Trustee Scott E. Eisenberg's ("Plaintiff-Trustee") Motion for Summary Judgment [Adv. Doc. #28][1], Defendant Toledo-Lucas County Port Authority's ("Defendant" or "Port Authority") Motion for Summary Judgment [Adv.

---

1/ Throughout this memorandum., citations to the Adversary Proceeding docket are made via [Adv. Doc. #__] and the underlying Chapter 11 bankruptcy case docket via [Doc. #__].

Doc. #29], Defendant's Opposition Reply to Trustee's Motion [Adv. Doc. #32], and Plaintiff-Trustee's Objection to Port Authority's Motion [Adv. Doc. #33]. In the Complaint, Plaintiff-Trustee seeks to avoid and recover Debtor's post-petition transfers to Defendant pursuant to 11 U.S.C. §§549 and 550. [Adv. Doc #1, pp 4-5].

The court has jurisdiction over the underlying Chapter 11 case and this adversary proceeding pursuant to 28 U.S.C. §§1334, 157(a), and Local General Order 2012–7 of the United States District Court for the Northern District of Ohio. Actions to avoid and recover post-petition transfers are core proceedings that this court may hear and determine. 28 U.S.C. §157(b)(1) and (b)(2)(A), (M), and (O).

For the following reasons, Plaintiff-Trustee's Motion for Summary Judgment will be denied and Defendant's Motion for Summary Judgment will be granted.

## Factual Background

Debtor BX Acquisitions, Inc. ("Debtor") was a Delaware corporation[2] with its principal place of business located at One Air Cargo Parkway East, Swanton, Ohio. [Adv. Doc. #30-1, Ex. 1, p. 5]. Debtor provided customized logistics solutions to the transportation and distribution industries. [Adv. Docs. #1, p. 2, ¶1; #14, p. 1, ¶1.]. Defendant is an Ohio port authority, political subdivision, and a body corporate and politic, organized and operating under the applicable provisions of Chapter 4582 of the Ohio Revised Code. [Adv. Doc. #30-1, Ex. A, p. 1]. Defendant's principal place of business is located at One Maritime Plaza, Toledo, Ohio. [Adv. Doc. #30-1, Ex. 1, p. 5]. Among other duties, Defendant owns and manages the facility at issue in this case, an intermodal cargo sort facility ("Facility") located at Toledo Express Airport. [Adv. Doc. #30, p. 4].

On October 31, 2011, Debtor entered into a Facilities and Services Management Agreement ("Management Agreement") with Defendant that outlined the relationship between the parties as it pertained to Debtor's use of the Facility located at the Toledo Express Airport. [Adv. Docs. #1, p. 3, ¶8; ; #14, p. 2, ¶8; #28-1, Ex. A]. The Management Agreement provided that in exchange for Debtor's use, management, and maintenance of the Facility, Debtor promised to pay Defendant: 1) a periodic fixed annual fee ("Fixed Fee") due semiannually in 2012 and 2013 and then monthly beginning in 2014; and 2) a percentage-based fee based on Debtor's gross annual revenues. [Adv. Doc. #28-1, pp. 5-6].

---

2/ Adv. Docs. #1, p. 2, ¶1; #14, p. 1, ¶1.

17-03024-jpg    Doc 34    FILED 05/04/18    ENTERED 05/04/18 14:43:20    Page 2 of 17

After two amendments were made to the Management Agreement during the course of 2013 that are not relevant here, Defendant alleges that the Port Authority and the Debtor began operating under a Third Amendment to the Management Agreement beginning in 2014. [Adv. Doc. #30-1, p. 2]. The Third Amendment, finalized in July 2015 per Defendant, provided that instead of periodic Fixed Fee payments, Debtor would pay Defendant a Fixed Fee of $500,000.00 on or before December 31 of each contract year. [Adv. Doc. #28-2; Adv. Doc. #30-1, Ex. 1, pp. 5-9]. Notably, the Third Amendment does not contain the signatures of the parties [*Id.*, p. 9]. Defendant avers that both the Port Authority and the Debtor treated the Third Amendment as effective and binding until it was later rejected during the course of Debtor's bankruptcy. [Adv. Doc. #30-1, pp. 9, 2].[3] The Third Amendment reflects that it was authorized by the Port Authority's Board of Directors and "Manager's" (*i.e.*, Debtor's) Board of Directors. [Doc. #30-1, p. 5, ¶D].

Defendant's general counsel's affidavit states that "[u]nder the terms of the Third Amendment, BX owed the Port Authority a fee of $500,000.00 by December 31, 2015. BX was entitled to take a credit against that payment in the amount of $350,000.00…." [*Id.*, p. 2]. Defendant's general counsel also maintains that Debtor paid the 2014 Fixed Fee via a single annual payment as required under the Third Amendment[4] and had not made any 2015 Fixed Fee payments as of the date of Debtor's bankruptcy filing. [*Id.*]. Further, according to Defendant's general counsel's affidavit, Debtor had post-petition communication with Defendant regarding Debtor's intent to assume the Management Agreement during the course of its Chapter 11 proceedings and eventually extend its terms. [*Id.*, p. 3, ¶13].

On November 2, 2015, Debtor filed a voluntary Petition for Chapter 11 bankruptcy relief [Doc. #1] that included reference to Defendant and the Management Agreement on Schedule G, "Executory Contracts and Unexpired Leases." [*Id.*, p. 30]. On that same day, Debtor filed a Motion to Use Cash Collateral [Doc. #6] with an attached budget, running from November 1, 2015 through December 31, 2015. The Motion did not include any payments intended for Defendant, either in the Motion itself or the attached budget. [Doc. #6-4]. The court entered an Order

---

3/ Plaintiff-Trustee acknowledges that "the parties agreed to the Third Amendment…." [Doc. #28, p. 10]. Plaintiff-Trustee provided no evidence that would contradict the averments in the Affdavit of Dawn W. Wenk, Esq.

4/ *See generally*, *Allen v. Ford Motor Co.*, 8 F.Supp.2d 702, 706 (N.D. Ohio 1998)("Where the signature of one of the parties is a condition precedent to a binding contract, that condition may be waived by performance under the contract, as such performance indicates that the contract has been accepted.").

3

shortening the time for notice to one day. [Doc. #8]. The Hearing on cash collateral was held on November 3, 2015, and the court's proceeding memo reflected that the parties were "to circulate and submit an agreed Order." [Doc. #13]. The Agreed First Interim Order for use of cash collateral, adequate protection, and setting an additional hearing was entered on November 4, 2015. [Doc. #15].

The proposed Agreed First Interim Order that was submitted (and signed) included a budgeted payment to Defendant of $208,685.45 on December 30, 2015. [Doc. #15, p. 25]. On November 4, 2015, prior to the second cash collateral hearing on November 10, 2015, notice went out to the creditors listed in Doc. #14, pp. 3-7. By the court's count, notice went out to three parties electronically, and to 73 creditors by first class mail. [*Id.*] That notice included the text of an Agreed Second Interim Order authorizing the use of cash collateral, and an Exhibit 1, which included a budgeted payment of $208,685.45 to Defendant. [Doc. #14-1, p. 25].

> In the body of the Notice Regarding Entry of Second Interim Order [Doc. #14], it states: A copy of this proposed order and the related budget is attached hereto. A hearing is to be set by the Court on the entry of this Order for November 10, 2015, at 11:00 A.M., at the United States Bankruptcy Court for the Northern District of Ohio, 1716 Spielbusch Avenue, Courtroom No. 2, Toledo, OH.
>
> Notice is hereby given that any party wishing to object to the entry of the Second Interim Agreed Order for the Use of Cash Collateral should attend this hearing and/or file an objection to the entry of the Order. Any Objection should be filed with the Clerk of the Court and served on counsel for the Debtor and the Office of the U.S. Trustee, prior to the time of the hearing set by the Court on the matter; otherwise, the Court may deem any opposition waived, and issue an order granting the requested relief without further notice of hearing. [Doc. #14, p. 2].

The proposed Second Interim Order attached to the Notice also states: "21. ***Controlling Effects of Interim Order.*** To the extent any provision of this Interim Order conflicts or is inconsistent with any provision prior [*sic*] Motion, the provisions of this Interim Order shall control." [Doc. #14-1, p. 12]. When the final version of the Second Interim Order was submitted, it included the same $208,685.45 payment in the budget. [Doc. #39, p. 25].

The court later entered an Agreed Second Interim Cash Collateral Order (collectively

"Cash Collateral Orders"), on November 10, 2015 after a hearing held the same day. [Doc. #39].[5] Relevant here, both Cash Collateral Orders provided as follows:

> 7. *Findings Regarding the Use of Cash Collateral and Pre-petition Collateral*
>
> (a) Good cause has been shown for immediate entry of this Interim Order.
>
> (b) The Debtor has an immediate and critical need to use the Cash Collateral in which it has an interest. Authorization to use the Cash Collateral is therefore (i) critical to the Debtor's ability to maximize the value of its chapter 11 estate, (ii) in the best interests of the Debtor and its estate, and (iii) necessary to avoid immediate and irreparable harm to the Debtor, its creditors, and its assets, businesses, goodwill, reputation, and employees.
>
> (c) The terms of the use of the Cash Collateral pursuant to this Interim Order are fair and reasonable solely for purposes of this Interim Order, and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.
>
> (d) The Lender has consented to, conditioned upon entry of this Interim Order, the Debtor's proposed use of the Cash Collateral on an interim basis, on the terms and conditions set forth in this Interim Order.
>
> (e) The Debtor's use of Cash Collateral has been negotiated in good faith and at arms' length between the Debtor and the Lender, and the Lender's consent to the Debtor's use of its Cash Collateral on an interim basis in accordance with the terms of this Interim Order shall be deemed to have been made in "good faith."
>
> 8. *Authorization of Use of Cash Collateral*. The Debtor is hereby authorized to use Cash Collateral…solely in accordance with the Budgets (as defined herein) and the other terms and conditions set forth in this Interim Order.

[Doc. #15, p. 4; Doc. #39, p. 4].

Both Cash Collateral Orders had as an Exhibit an attached budget that provided for Debtor's payment to Defendant in the amount of $208,685.45 on December 30, 2018, though neither the Order itself, nor the attached budget, identified the payment as being for a pre-petition obligation. [Doc. #15, p. 25; Doc. #39, p. 25]. Additionally, both Orders provided for service of

---

[5]/ Though the first Cash Collateral Order hearing took place on an emergency basis, one day after Debtor's filing, and occurred before the court generated a hearing Certificate of Notice [Doc. #16], the second Cash Collateral Order hearing occurred after record parties in interest received notice via a court-generated hearing Certificate sent by first class mail. [Doc. #29].

notice on: 1) the U.S. Trustee; 2) the U.S. Attorney for the Northern District of Ohio; 3) the cash collateral lender, Alder Fels Group, LLC; 4) lender's counsel; 5) the twenty largest unsecured creditors of Debtor; 6) the Internal Revenue Service; 7) and all other parties who made an appearance and request for notice in Debtor's Chapter 11 case. [Doc. #15, p. 3; Doc. #39, p. 3]. Neither Cash Collateral Order was objected to, nor was either appealed or subject to a motion for reconsideration.

In the same time frame, the Debtor also filed a Motion to Pay Critical Vendors [Doc. #23] and a Motion to Pay Pre-Petition Employee Wages [Doc. #25] on November 6, 2015. These two Motions were unopposed, and were granted on November 10, 2015. [Doc. #40, 41]. Both Motions identified the extent to which they related to the payment of Debtor's pre-petition obligations. [Doc. 23, p. 1; Doc. #25, pp. 3-4].

On November 18, 2015, the Office of the United States Trustee filed a Notice of Appointment of a Creditors' Committee. [Doc. #46]. Counsel for the Creditors' Committee filed an entry of appearance on November 25, 2015. [Doc. #48]. An Application to Employ counsel for the Creditors' Committee was filed on December 7, 2015 [Doc. #54], along with an Application to Employ a financial advisor. [Doc. #55].

Plaintiff-Trustee and Defendant agree that Debtor made $50,000 payments to the Defendant on November 27, 2015, December 2, 2015, and December 3, 2015, totaling $150,000.00[6] ("Disputed Payments"), an amount that both parties regard as satisfying the Debtor's 2015 Fixed Fee obligation under the Management Agreement and Third Amendment. [Adv. Doc. #28, p. 7; Adv. Doc. #30-1, p. 2].[7]

As the case continued, Debtor's business operations did not go well.[8] On January 31, 2016, Debtor filed a Motion to Reject Lease or Executory Contract in which Debtor asserted that,

---

6/ Plaintiff-Trustee's Complaint seeks to avoid transfers amounting only to $101,000.00 because he does not dispute the court's allowance of Defendant's administrative expense claim of $49,000.00. [Doc. #206, pp. 2, 3]. The reasons why payment amounted to $150,000 instead of $208,685.45, appears to be the result of a negotiated reduction. [Doc. 30-1, Ex. 2]. No contrary evidence was offered by the Plaintiff-Trustee. Why the allowed January, 2016 administrative expense is a "setoff" of the $150,000 paid (other than the fact that this was an agreement reached with the Unsecured Creditor's Committee [Doc. #199, p. 2]), was not explained in the pleadings filed by either party.

7/ A payment lower than the $208,685.45 set forth in the Cash Collateral Orders was agreed to by the Debtor and the Defendant. [Adv. Doc. #30-1, Ex. 2].

8/ Plaintiff-Trustee alleged, in a separate adversary proceeding, that a major contract with The SkyLIFE Company, Inc. was improperly terminated in January, 2016. *See*, Adv. Case 17-3019, Doc. #1.

6

in its business judgment, it would be financially burdensome for Debtor to continue to operate under the Management Agreement with Defendant given that Debtor had ceased its logistics business operations. [Doc. #90, pp. 3-5]. The court granted Debtor's Motion to Reject on April 27, 2016 ("Rejection Decision"). [Doc. #199]. The Agreed Order of Rejection, entered on May 5, 2016, provided that: 1) Defendant was entitled to an administrative claim of $49,000.00 comprised of $25,000.00 for Debtor's use of the Facility for November and December of 2015 and $24,000.00 for Debtor's use of the Facility for January of 2016; 2) Debtor's estate retained its ability to challenge any allegedly improper post-petition payments Debtor made to Defendant; and 3) the Management Agreement was deemed rejected as of January 15, 2016. [Doc. #206, pp. 2, 3].

The court confirmed Debtor's Joint Plan of Liquidation on October 11, 2016 [Doc. #321], which provided for, among other things, the establishment of the BX Acquisitions, Inc. Liquidating Trust and the appointment of a Liquidating Trustee. [Doc. #210, pp. 13-14]. On December 8, 2016, Debtor filed a Liquidating Trust Agreement through which Plaintiff-Trustee was appointed as Liquidating Trustee. [Doc. #334-1, p. 6].

Plaintiff-Trustee filed the Complaint underlying this Adversary Proceeding on March 16, 2017. [Adv. Doc. #1]. In the Complaint, Plaintiff-Trustee alleges that: 1) the $150,000.00 in Disputed Payments Debtor made to Defendant in late November and early December of 2015 constituted unauthorized, post-petition transfers subject to avoidance under 11 U.S.C. §549; and 2) said transfers, once avoided, are subject to recovery by Plaintiff-Trustee under 11 U.S.C. §550. [*Id.*, pp. 4-6]. In its Answer, Defendant maintains that: 1) Debtor's November and December of 2015 payments to Defendant were authorized by both the first and second Cash Collateral Orders; and 2) even if not authorized by the Cash Collateral Orders, said payments figure as post-petition payments on a post-petition debt that were made in the ordinary course of Debtor's business and were thus a proper exercise of Debtor's authority to operate as a going concern. [Adv. Doc. #14, pp. 2-3].

Both Plaintiff-Trustee and Defendant filed Motions for Summary Judgment on November 10, 2017. [Adv. Doc. #28, 29]. In his Motion, Plaintiff-Trustee argues that the Disputed Payments were not authorized by the Bankruptcy Code because the acts giving rise to Debtor's obligation to Defendant took place pre-petition. Thus, the Disputed Payments were post-petition transfers on account of a pre-petition debt. [Adv. Doc. #28, pp. 9-10]. Plaintiff-Trustee's Motion also argues that the Disputed Payments were not authorized by the Cash Collateral Orders because: 1) the

7

Cash Collateral Orders failed to provide interested parties with proper notice that payments on a pre-petition debt were being authorized; and 2) finding the Disputed Payments to be authorized by the Cash Collateral Orders conflicts with language contained in the court's decision granting Debtor's Motion to Reject the Management Agreement. [*Id.*, pp. 10-12].

In its Memorandum in Support of its Motion, Defendant argues that the Disputed Payments are not avoidable because they were post-petition payments on a post-petition debt paid in the ordinary course of Debtor's business. [Adv. Doc. #30, pp. 12-14]. Defendant further argues that, even if the Disputed Payments are regarded as having been made on account of pre-petition debt, they were expressly authorized by the Cash Collateral Orders and attached budgets. [*Id.*, pp. 15-18]. Further, Defendant maintains that allowing Plaintiff-Trustee to avoid and recover the Disputed Payments would create uncertainty for creditors in Chapter 11 cases, be detrimental to the reorganization process, and should not be allowed. [*Id.*, pp. 19-20].

There is no allegation that Defendant is or was an "insider" of the Debtor-In-Possession, or that the payments to Defendant benefited an insider, nor is there any allegation of fraud. *See e.g.*, *Spradlin v. Williams (In re Alma Energy, LLC)*, 2010 WL 4736905, 2010 U.S. Dist. LEXIS 1216 (E.D. Ky. Nov. 16, 2010).

In light of the facts and arguments of the movants, there are two questions presented: 1) were the Disputed Payments properly authorized by the Cash Collateral Orders?; and 2) if the payments were not authorized by the Cash Collateral Orders, were the Disputed Payments nonetheless valid under the Bankruptcy Code as payments on a post-petition debt made in the ordinary course of Debtor's business?

## Law and Analysis

### I. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In reviewing a motion for summary judgment, however, all inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88, 106 S.Ct. 1348, 1355-57, 89 L.Ed.2d 538 (1986).

8

17-03024-jpg    Doc 34    FILED 05/04/18    ENTERED 05/04/18 14:43:20    Page 8 of 17

The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, "and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The moving party can discharge its initial burden of proof by either coming forward with evidence showing the absence of a genuine issue of material fact, or by showing that there is no such issue by pointing out to the court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2554.

Where the moving party has met its initial burden, the adverse party "may not rest upon the mere allegations or denials of his pleading but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if the evidence is such that a reasonable factfinder could find in favor of the nonmoving party. *Id.* "The non-moving party, however, must provide more than mere allegations or denials ... without giving any significant probative evidence to support" its position. *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate. "When parties file cross-motions for summary judgment, 'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Parks v. LaFace Records*, 329 F.3d 437, 444-445 (6th Cir. 2003)(quoting *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001)); 10a Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2720 (1998).

**II. The Disputed Payments Were Properly Authorized by the Cash Collateral Orders**

At the time the Cash Collateral Orders were entered in November of 2015, Debtor was attempting to voluntarily reorganize under Chapter 11 of the Bankruptcy Code as a Debtor-In-Possession. As a Debtor-In-Possession, Debtor maintained the powers of a Chapter 11 trustee and could, among other things, negotiate for its post-petition use of cash collateral, subject to court

9

17-03024-jpg    Doc 34    FILED 05/04/18    ENTERED 05/04/18 14:43:20    Page 9 of 17

approval. *See*, 11 U.S.C. §§1107(a), 363(b)(1) and (c)(2)(B)[9]; *Terlecky v. Peoples Bank, Natl. Assoc.* (*In re Amerigraph*), 456 B.R. 349, 356 (Bankr. S.D. Ohio 2011). As such, during the early days of its attempt at Chapter 11 reorganization, Debtor negotiated with Defendant and its lender regarding payments required under the Management Agreement based upon the Debtor's intent to assume the Management Agreement.[10] [Adv. Doc. #30-1, p. 3]. The payment agreement was memorialized in the Cash Collateral Orders. [*Id*.]. A payment lower than the $208,685.45 was agreed to by the Debtor and the Defendant. [Adv. Doc. #30-1, Ex. 2]. Debtor then made the Disputed Payments to Defendant on November 27, 2015, December 2, 2015, and December 3, 2015. [Adv. Doc. #28, p. 7; Adv. Doc. #30-1, p. 2].

Plaintiff-Trustee seeks to avoid the Disputed Payments under 11 U.S.C. §549, which provides that "…the trustee may avoid a transfer of property of the estate… (1) that occurs after the commencement of the case; and…(B) that is not authorized under this title or by the court." Once a transfer is avoided, a trustee can recover, for the benefit of the estate, the amounts transferred. 11 U.S.C. §550(a). Thus, in order to avoid the Disputed Payments, Plaintiff-Trustee must establish that the Cash Collateral Orders were not valid court authorizations[11] of the Disputed Payments.

Courts faced with a challenge to an already entered and final cash collateral order have focused on the extent to which adequate notice was provided to parties of interest. *See*, *Amerigraph*, 456 B.R. at 356-57 (collecting cases holding that the binding effect of a cash collateral order relies on proper notice); *Hill v. Akamai Techs., Inc.* (*In re MS55*), 477 F.3d 1131, 1134-35 (10th Cir. 2007). Further, cash collateral orders have been described as a kind of consent

---

9/ Because the Cash Collateral Orders were appropriately noticed out and heard before their approval, the court need not decide whether or not the Disputed Payments were made in the ordinary course of Debtor's business. *See*, 3 Collier on Bankruptcy ¶363.03 (16th Ed. 2018) ("Thus, in any case in which the parties are unsure about whether their transaction is in the ordinary course of business, it is advisable to comply with the notice and hearing requirement of section 363(b) rather than to rely on the ordinary course of business authorization under section 363(c)."). However, for purposes of the cross Motions for Summary Judgment at hand, the court will construe the facts in favor of the non-moving party where appropriate.

10/ During the same time period, Debtor was rejecting a lease, and a sublease, of a facility located in Dallas, Texas. [Docs. ##53, 56, 57, 67].

11/ Based on the statutory language, requiring that the transfer be "unauthorized", the court will not consider other legal theories that have been used to defend against attempts to undo transactions entered into during a Chapter 11 case. *See e.g.*, *Angell v. Meherrin Agric. & Chem. Co. (In re Tanglewood Farms Inc. of Elizabeth City)*, 2013 WL 1829910, 2013 Bankr. LEXIS 1849 (Bankr. E.D.N.C. May 1, 2013)(discussing waiver and estoppel in the context of a Chapter 7 trustee seeking to undo actions taken by the Chapter 11 debtor).

decree construed for enforcement purposes as a contract. *Ohio Farmers Ins., Co. v. Hughes-Bechtol, Inc. (In re Hughes-Bechtol, Inc.)*, 225 F.3d 659 (Table), 2000 WL 1091509 at *3, 2000 U.S. App. LEXIS 18741 at **9-10 (6th Cir. July 27, 2000). Accordingly, interpretation of a cash collateral order begins with "looking to the explicit language of…the cash collateral order for 'clear manifestations of intent.'" *Id.* (quoting *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654 (6th Cir. 1996)).

Moreover, because §1107(a) of the Bankruptcy Code grants a debtor-in-possession the powers of a trustee, it is "well established that a Chapter 7 trustee succeeds to the rights of the debtor-in-possession and is bound by prior actions of the debtor-in-possession to the extent approved by the court." *MS55*, 477 F.3d at 1135. *See also*, *Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.)*, 503 F.3d 933, 944 (9th Cir. 2007); *Armstrong v. Norwest Bank, Minneapolis, N.A.*, 964 F.2d 797, 801 (8th Cir. 1992) ("[I]t is axiomatic that the [Chapter 7] Trustee is bound by the acts of the debtor-in-possession [.]"); *Amerigraph*, 456 B.R. at 356; *Pollack v. FDIC (In re Monument Record Corp.)*, 71 B.R. 853, 862 (Bankr.M.D.Tenn.1987) ("The courts recognize that the acts of the debtor-in-possession generally bind a subsequently-appointed trustee."); *In re Philadelphia Athletic Club*, 17 B.R. 345, 347 (Bankr. E.D. Pa. 1982)("To hold that . . . [the actions of the debtor-in-possession are] not binding on the estate after the appointment of a trustee would greatly impair the ability of the debtor in possession to conduct its business because it would discourage third parties from dealing with the debtor in possession for fear that the court would later appoint a trustee and declare that the actions taken by the debtor in possession are invalid and not binding on the trustee.").

Just as a Chapter 7 Trustee is bound by the bankruptcy court's prior orders entered in a Chapter 11 case, a liquidating trustee is a successor in interest to the estate, and is similarly bound. *See*, *In re Gainey Corp.*, 447 B.R. 807, 820 (Bankr. W.D. Mich. 2011). As the *Amerigraph* decision stated:

> Thus, an agreement made by a debtor-in-possession that is set forth in an agreed cash collateral order generally will - unless the order expressly states otherwise - be binding on a Chapter 7 Trustee. *See MS55, Inc*., 477 F.3d at 1135; *Armstrong*, 964 F.2d at 801; *In re Bettis*, 97 B.R. 344, 347 (Bankr.W.D.Tex.1989). The general rule serves the salutary purpose of encouraging creditors "to deal freely with debtors-in-possession, within the confines of the bankruptcy laws, without fear of ... reversal at the hands of a later appointed trustee." *Armstrong*, 964 F.2d at 801. Put differently, the general rule "will encourage lien creditors to better cooperate

11

with a reorganizing debtor and reduce pressure, early in the case, to litigate and, perhaps, prematurely 'pull the plug' on a debtor." *In re Buzzworm, Inc.*, 178 B.R. 503, 509 (Bankr.D.Colo.1994).

*Amerigraph*, 456 B.R. at 356.

Here, the court finds that the Cash Collateral Orders disclosed Debtor's intent to make the Disputed Payments to Defendant pursuant to the terms of the amended Management Agreement Debtor referenced in its original Chapter 11 filings. Under the terms of the Third Amendment to the Management Agreement, Debtor had a payment obligation due Defendant on or before December 31, 2015. [Adv. Doc. #30-1, p. 7]. That obligation, pre-petition or not, was provided for in the Agreed Cash Collateral Orders (albeit in the only attached Exhibit) to which there were no objections, or requests to reconsider or amend.

At the initial cash collateral hearing, held on a Motion that did not include any provision for payments to Defendant, the court's proceeding memo reflected that the parties were "to circulate and submit an agreed Order." [Doc. #13]. The proposed Order that was submitted included a budgeted payment to Defendant of $208,685.45 to be made on December 30, 2015. [Doc. #15, p. 25]. On November 4, 2015, prior to the second cash collateral hearing on November 10, 2015, notice went out to the creditors listed in the Certificate of Service. [Doc. #14, pp. 3-7.] That notice included the text of an Agreed Second Interim Order authorizing the use of cash collateral, and an Exhibit 1, which again included a payment of $208,685.45 to Defendant. [Doc. #14-1, p. 25]. When the final version of the Second Interim Order was submitted, it included the same $208,685.45 payment in the budget. [Doc. #39, p. 25].

The court recognizes that the actual amounts paid to Defendant were less than the amounts stated in the budgets attached to the cash collateral orders - $150,000 versus $208,685.45 - but the payments were made before December 30, 2015.[12]

Nevertheless, the court finds that the Disputed Payments were validly authorized by the Cash Collateral Orders and are not subject to avoidance by the Plaintiff-Trustee under §549.

Plaintiff-Trustee contends that the Disputed Payments were not authorized by the Cash

---

12/ If the Creditor's Committee had sought relief from this payment provision in the Cash Collateral Orders after the payment(s) had been made but before December 30, 2015, the court would have found the parties' reliance on the stated payment date to weigh heavily in favor of reconsidering the Orders' authorization of the Disputed Payments. But here, Plaintiff-Trustee cannot claim to have relied on the stated payment date, which passed months before he was appointed.

Collateral Orders because the Orders failed to provide notice to parties in interest that Debtor was making payments on a pre-petition debt. However, the court finds this argument unpersuasive because, even if Debtor's payments to Defendant were on account of a pre-petition debt, both Cash Collateral Orders, their attached budgets, and the related hearings provided sufficient notice to parties of interest under 11 U.S.C. §363 and Bankruptcy Rules 2002 and 4001. *See*, *Amerigraph*, 456 B.R. at 356-57.

Though the expedited Cash Collateral Order hearings were on notice shorter than the 21 and 14 day timeframes laid out in Bankruptcy Rules 2002(a)(2) and 4001(b)(2), both Rules allow courts to expedite proceedings "for cause" and "as is necessary to avoid immediate and irreparable harm to the estate," respectively. *See*, 3 Collier on Bankruptcy, ¶363.03[4] at 363-35 (16th Ed. 2018). To that end, the court expressly acknowledged the emergency nature of the early Chapter 11 proceedings and the importance of adequate notice at both Cash Collateral Order hearings. [Doc. #360, p. 3; Doc. #361, pp. 3-4].

Additionally, both Cash Collateral Orders - agreed orders that were circulated among the parties and went without objection or appeal - expressly provided that the payments listed in the attached budgets were "(i) critical to the Debtor's ability to maximize the value of its chapter 11 estate, (ii) in the best interests of the Debtor and its estate, and (iii) necessary to avoid immediate and irreparable harm to the Debtor, its creditors, and its assets, businesses, goodwill, reputation, and employees." [Doc. #15, p. 4; Doc. #39, p. 4]. Further, the fact that Debtor included reference to its Management Agreement with Defendant in its initial Chapter 11 filing [Doc. #1, p. 30] further bolsters this court's conclusion that parties of interest were on notice that Debtor would be making payments to Defendant during the early days of its attempt at reorganization.[13]

Plaintiff-Trustee also argues that the Cash Collateral Orders failed to provide adequate notice because they made only a "passing reference" to the Disputed Payments, and in support cites to *In re Aztec Supply Corp.*, 399 B.R. 480, 486 (Bankr. N.D. Ill. 2009). This argument is unpersuasive for two reasons. First, the Disputed Payments are laid out in the Cash Collateral Orders' attached budgets in the same manner as all the other payments listed. Thus, related to a pre-petition debt or not, every item in the budgets attached to the Cash Collateral Orders would

---

13/ The court does not reach the question of whether the Disputed Payments were made on account of a pre-petition debt because the Cash Collateral Orders, particularly the Second Interim Order, was a court authorization of the Disputed Payments. However, for purposes of addressing the Motions for Summary Judgment, the court construes the Disputed Payments as being on account of a pre-petition debt.

13

fail the test being put forth by Plaintiff-Trustee. Second, *Aztec Supply Corp.* concerned "a form of declaratory judgment adjudging the validity of a party's interest in [a] check," a provision in a cash collateral order that the *Aztec Supply Corp.* court described as "not the type of relief normally contained in a motion for use of cash collateral…." 399 B.R. at 487-86. Accordingly, the court finds the holding in *Aztec Supply Corp.* to be inapplicable to the case at hand. In contrast to the validity of the check at issue in *Aztec Supply Corp.*, interim requests for payment authority needed for a debtor's reorganization, like the Disputed Payments, are "the type of relief normally contained in" cash collateral motions and orders. *Id.*

In situations where more common uses of cash collateral are authorized, courts have recognized the importance of not chilling "normal-course arrangements and compromises in Chapter 11 cases." *Official Comm. Of Unsecured Creditors v. Belgravia Paper Co. (In re Great Northern Paper, Inc.)*, 299 B.R. 1, 7 (D. Maine 2003). While the Motions to pay critical vendors and employees were separately noticed, with information about the obligations being pre-petition debts, authorization of those payments require a debtor-in-possession to meet a much higher burden, as those payments would be contrary to the polices underlying 11 U.S.C. §1122(a) and Rule 6003(b).

Plaintiff-Trustee quotes a passage in *Jevic* where the Supreme Court cited a Seventh Circuit decision on the justification for critical-vendor orders, which indicated such decisions usually find that allowing such payments would "enable a successful reorganization and make even the disfavored creditors better off." *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 985, 197 L.Ed.2d 398 (2017). To the extent that Plaintiff-Trustee is arguing that this high standard applies to a debtor-in-possession's decision to assume an executory contract – and pay any pre-petition default in full – the established case law suggests otherwise. A debtor-in-possession's decision to assume an executory contract has been subject to a "business judgment" standard, and it does not appear that the *Jevic* decision changes that criteria. *See generally*, 3 Collier on Bankruptcy, ¶365.03[2] at 365-26 – 27 (16th Ed. 2018)("Although the business judgment [standard] is the proper standard for determining whether to permit assumption or rejection of an executory contract or unexpired lease, the court should focus on the business judgment of the trustee or debtor in possession, not on its own business judgment.").

In contrast to critical vendor payments that require resort to the "doctrine of necessity," the Bankruptcy Code does not allow assumption of an executory contract, such as the Debtor-In-

14

Possession's Management Agreement with Defendant, without full payment of the pre-petition arrearages. "The language and intent behind §365 is decisive. The language of §365(b)(1) is unequivocal. A party to an executory contract must be paid all amounts due him under the contract before the contract may be assumed. In drafting §365(b)(1), Congress went further than requiring that the trustee guarantee payment for future performance under the contract. It required that the trustee guarantee payment of all amounts owed prior to assumption." *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996).

Moreover, while the better practice would have been to provide specific notice that there was an issue as to whether or not the payments to Defendant were for pre-petition obligations, it is difficult to imagine that disclosure of that issue – no matter how complete – would have drawn an objection from any creditor or party in interest in this case. The creditors, and the Office of the United States Trustee, did not object to the payment of pre-petition obligations to the "critical vendors" or to the employees, even with full knowledge that the payments were for obligations that were pre-petition. It appears highly unlikely that payments that would have been required to be made if the Debtor-In-Possession were to have the right to remain in its primary facility would have actually drawn an objection regardless of the level of disclosure.

Plaintiff-Trustee also cites to *Eggmann v. Parker-Hannifin Corp.* (*In re PJM Enters. of Marion, Inc.*), 2010 WL 148631, 2010 Bankr. LEXIS 28 (Bankr. S.D. Ill. January 12, 2010) for the proposition that, in order for a cash collateral order to properly authorize payments on a pre-petition debt, the order must outline the pre-petition nature of the debt explicitly. However, the court finds that *PJM Enters.*, an unpublished out-of-circuit decision, to be distinguishable. Unlike the case at hand, *PJM Enters.* involved payments to a vendor/contractor who refused to continue doing business with the debtor-in-possession unless the parties came to a compromise regarding pre-petition debts. 2010 WL 148631 at *1, 2010 Bankr. LEXIS 28 at *2. Consequently, the court finds that the Management Agreement, a unique agreement in the form of an executory contract/lease, and Defendant's position as a premises owning port authority implicate concerns that were not before the *PJM Enters.* court.

Additionally, *PJM Enters.* did not announce a rule to the effect that cash collateral orders must identify pre-petition debts, instead holding that the orders before it were valid because they "specifically authorized the Debtor to make the payment at issue…" and that "[a]ny objections to whether Defendant was properly labeled a critical vendor should have or could have been raised

17-03024-jpg    Doc 34    FILED 05/04/18    ENTERED 05/04/18 14:43:20    Page 15 of 17

in response…." 2010 WL 148631 at *2, 2010 Bankr. LEXIS 28 at *8. The court finds that to be what happened here - the Cash Collateral Orders "specifically authorized the Debtor to make the payment[s] at issue" and "[a]ny objections to whether" the Disputed Payments were "properly labeled a[s] critical" to Debtor's attempt at reorganization "should have or could have been raised" before, during, or after the two hearings held prior to their approval. *Id.* Here, there was adequate notice that the Debtor-In-Possession was seeking authority to pay $208,685.45 in the Second Interim Order, and the Creditors and other parties in interest had the opportunity to inquire about why the DIP believed the proposed payment was "critical" either before, or during, the hearing held prior to the entry of that Order.

Plaintiff-Trustee's final argument that the Cash Collateral Orders did not authorize the Disputed Payments because of conflicting language in the court's Rejection Decision is unpersuasive because it does not account for the context of the Decision's reference to the Disputed Payments. As Defendant points out, the phrase "preserving the estate's ability to seek disgorgement of approximately $150,000 that the Port Authority received post-petition for pre-petition rent" must be understood against the backdrop of the paragraph in which it appeared:

> Specifically, the OCUC [Official Committee of Unsecured Creditors] asserts that an agreement was reached limiting the Port Authority's "Allowed Administrative Claim" to $49,000, which the OCUC agreed not to challenge, *while preserving the estate's ability to seek disgorgement of approximately $150,000 that the Port Authority received post-petition for pre-petition rent*. To the extent the estate was able to successfully obtain a disgorgement order for the rent payments, the Port Authority would be able to set-off the Allowed Administrative Claim against the amounts that would otherwise have to be disgorged. [Doc. #135, p. 2]. However, the set-off would be limited to $49,000.

[Doc. #199, p. 2] (emphasis added). Thus, the court's reference to the OCUC's assertion during the course of providing the Rejection Decision with a factual background was just that, a reference, and is irrelevant to whether the Cash Collateral Orders authorized the Disputed Payments.

### III. Conclusion

Although the Cash Collateral Orders could have, and should have, been more explicit with regards to the nature of the payments being authorized, the record reflects that both Orders sufficiently set forth and described the Disputed Payments as being necessary to Debtor's attempt at reorganization. Further, the fact that Debtor's payments to Defendant were authorized by *two* agreed Cash Collateral Orders, both of which were entered after hearings, and were noticed to

creditors and other parties in interest, suggests that all record parties of interest were afforded sufficient opportunity to object to the Disputed Payments before they were made.  The proposed Second Interim Order was sent out as an Exhibit to all creditors and parties in interest before the hearing.  No objections were raised, nor was either Cash Collateral Order appealed or subject to a request for reconsideration.  Thus, because there was sufficient notice prior to the entry of the Second Interim Order, it provided court authorization of Debtor's payments to Defendant under 11 U.S.C. §§363 and 365, and prevents the court from finding that the payments were "not authorized" under 11 U.S.C. §549(a)(2)(B).  Accordingly, the court finds that Defendant is entitled to judgment as a matter of law.

THEREFORE, for the foregoing reasons, good cause appearing,

IT IS ORDERED that Plaintiff-Trustee's Motion for Summary Judgment [Adv. Doc. #28] be DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [Adv. Doc. #29] be GRANTED.

IT IS SO ORDERED.